1  Richard D. McCune, State Bar No. 132124
   rdm@mccunewright.com
2  David C. Wright, State Bar No. 177468
   dcw@mccunewright.com
3  **MCCUNE WRIGHT AREVALO LLP**
   3281 Guasti Road, Suite 100
4  Ontario, California  91761
   Telephone: (909) 557-1250
5  Facsimile: (909) 557-1275

6  Joseph G. Sauder
   jgs@mccunewright.com
7  Matthew D. Schelkopf*
   mds@mccunewright.com
8  Joseph B. Kenney
   jbk@mccunewright.com
9  **MCCUNE WRIGHT AREVALO LLP**
   555 Lancaster Avenue
10 Berwyn, PA 19312
   Telephone:  (610) 200-0581
11
   *Attorneys for Plaintiffs and the Putative Class*
12
   * *Pro hac vice application to be submitted*
13

14           **IN THE UNITED STATES DISTRICT COURT**

15          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16

| | |
|---|---|
| 17  CHRISTOPHER STANCZAK and ROSE CREPS, on behalf of themselves and all others similarly situated, | Case No.:  8:17-cv-1365 |
| 18 | **CLASS ACTION COMPLAINT** |
| 19                 Plaintiffs, | 1.  Violation of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*); |
| 20         v. | 2.  Violation of California Unfair Competition Laws (Cal. Bus. & Prof. Code § 17200); |
| 21  KIA MOTORS AMERICA, INC. and Does 1 through 10, inclusive, | 3.  Violation of California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*); |
| 22                 Defendants. | 4.  Violation of Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. tit. 5, § 205, *et seq.*); |
| 23 | 5.  Breach of Express Warranty; |
| 24 | 6.  Breach of Implied Warranty; |
| 25 | 7.  Breach of Written Warranty Under the Magnuson-Moss Warranty Act (15 U.S.C. §  2301, *et seq.*); |
| 26 | 8.  Common Law Fraud; |
| 27 | 9.  Breach of the Duty of Good Faith and Fair Dealing; |
| 28 | |

-1-

10. Violation of the Song-Beverly Act –
Breach of Implied Warranty (Cal. Civ.
Code §§ 1792, 1791.1, *et seq.*)

**DEMAND FOR JURY TRIAL**

**PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Christopher Stanczak and Rose Creps bring this action against Defendant Kia Motors America, Inc. ("KMA") and Does 1 through 10 (collectively "Defendant"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

**INTRODUCTION**

1. This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former owners and lessees with Theta 2.0-liter and 2.4-liter gasoline direct injection engines (the "GDI Engines") installed in certain Kia Optima, Sportage, and Sorento vehicles (the "Class Vehicles").[1]

2. This action arises from KMA's failure to disclose to Plaintiffs and similarly situated consumers, despite its longstanding knowledge, that the engines in the Class Vehicles contain, *inter alia*, a latent defect that results in the restriction of oil flow through the connecting rod bearings, as well as to other vital areas of the engine. This defect – which typically manifests itself during and shortly after the limited warranty period has expired – will cause the Class Vehicles to experience catastrophic engine failure and stalling while in operation.

3. Significantly, the presence of this defect, resulting in restricted oil flow within the engines, poses a safety risk to the operator and passengers of the Class

---

[1] Upon information and belief, the Class Vehicles include the following: MY 2015-16 Optima, MY 2015-16 Sportage, and MY 2105-16 Sorento.  Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles after conducting discovery.

Class Action Complaint
Case No. 8:17-cv-1365

Vehicles. The failure to have sufficient engine lubrication can cause complete and catastrophic engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death. As discussed further herein, numerous owners and lessees of the Class Vehicles have experienced engine damage and catastrophic failure while operating the Class Vehicles, thus placing themselves and those around them in immediate danger.

4.     Not only did KMA actively conceal the fact that particular components within the Class Vehicles' engines are prone to failure, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5.     KMA has long been aware of the defect described herein. Yet, KMA has routinely refused to repair the Class Vehicles without charge when the defect manifests. Indeed, in many cases KMA has even refused to disclose the existence of the defect when Class Vehicles displaying symptoms consistent with the defect are brought in for service, instead choosing to ignore the defect until it has caused significant mechanical problems necessitating costly repairs.

6.     Many other owners and lessees of the Class Vehicles have communicated with Defendant KMA and/or its agents to request that they remedy and/or address the defect and/or resultant damage at no expense. Defendant KMA has routinely failed to do so even within the warranty period.

7.     KMA has also refused to take any action to correct this concealed defect when it manifests in the Class Vehicles outside of the warranty period. Because the defect can manifest shortly outside of the warranty period for the Class Vehicles – and given KMA's knowledge of this concealed, safety related defect – Defendant KMA's attempt to limit the warranty with respect to the engine defect is unconscionable and unenforceable here.

Class Action Complaint
Case No. 8:17-cv-1365

8.      Despite notice and knowledge of the defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records, including durability testing, KMA has not recalled the Class Vehicles to repair the engine defect, offered its customers suitable repairs or replacements free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses to repair the defect.

9.      As a result of Defendant KMA's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendant KMA were conducted in a manner giving rise to substantial aggravating circumstances.

10.      Had Plaintiffs and other Class Members known of the defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

11.      Plaintiffs are also informed and believe, and on that basis allege, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendant KMA was forced to acknowledge that the Class Vehicles suffer from an inherent defect.

12.      As a result of the defect and the monetary costs associated with attempting to repair the defect, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendant's conduct.

13.      Accordingly, Plaintiffs bring this action to redress KMA's violations of California's consumer fraud statutes and the Maine Unfair Trade Practices Act, and also seek recovery for Defendant's breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and common law fraud.

## **JURISDICTION**

14.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more

-4-

Class Action Complaint
Case No. 8:17-cv-1365

1  class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000,
2  exclusive of interest and costs, and (iii) there is minimal diversity because at least one
3  plaintiff and one defendant are citizens of different States. This court has supplemental
4  jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5      15.     This Court has personal jurisdiction over Defendant because it has
6  conducted substantial business in this judicial district, and intentionally and purposefully
7  placed Class Vehicles into the stream of commerce within the districts of California and
8  throughout the United States.

9  **VENUE**

10     16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because
11 Defendant KMA's main corporate headquarters is located in this district, transacts
12 business in this district, is subject to personal jurisdiction in this district, and therefore is
13 deemed to be a citizen of this district. Additionally, there are one or more authorized Kia
14 dealers within this district and Defendant KMA has advertised in this district and has
15 received substantial revenue and profits from their sales and/or leasing of Class Vehicles
16 in this district; therefore, a substantial part of the events and/or omissions giving rise to
17 the claims occurred, in part, within this district.

18 **PARTIES**
19 **A.    Plaintiff Chris Stanczak**

20     17.     Plaintiff Chris Stanczak is a citizen of the State of California, and currently
21 resides in Lincoln, California.

22     18.     On or about October 8, 2014, Plaintiff leased a new 2015 Kia Optima LX
23 (VIN: KNAGM4A73F5554289) from Roseville Mitsubishi-Kia located in Roseville,
24 California. During his lease term, Plaintiff purchased his 2015 Kia Optima LX.

25     19.     In or about August 22, 2016, while driving on the highway, Plaintiff
26 Stanczak began to hear an unusual engine noise upon acceleration. He then brought his
27 vehicle to Roseville Mitsubishi-Kia, an authorized Kia dealership located in Roseville,
28 California, that same day.

Class Action Complaint
Case No. 8:17-cv-1365

20.     Roseville Kia had Plaintiff Stanczak's vehicle in its possession for diagnosis until on or about August 30, 2016. A service technician found, and notated in the repair order, that they had discovered metal shavings inside the vehicle's engine and that the vehicle's engine would need to be replaced. Plaintiff Stanczak then requested that such needed repairs be completed at no charge pursuant to the terms of the factory warranty. Plaintiff Stanczak's request was denied.

21.     Because Plaintiff Stanczak was denied the requested warranty repair, he then took his vehicle home so that he obtain a second opinion regarding the needed repairs. On the following day, while Plaintiff Stanczak was merging onto a highway, the engine in his vehicle seized and catastrophically failed while he was traveling at approximately 35 miles per hour. Fortunately, Plaintiff Stanczak was able to quickly pull his vehicle to the side of the road. He then phoned for road service and paid approximately $180 to have his vehicle towed back to Roseville Mitsubishi-Kia.

22.     Plaintiff Stanczak's vehicle remained at Roseville Mitsubishi-Kia from August 31, 2016, until October 3, 2016. Representatives of Roseville Mitsubishi-Kia initially informed Plaintiff Stanczak that the vehicle's long block needed to be replaced, but that the necessary parts were on backorder.

23.     Plaintiff Stanczak then contacted Kia's corporate offices and requested that Kia cover the necessary repairs under its warranties. Kia's corporate representative declined to honor Plaintiff Stanczak's request. Plaintiff Stanczak also requested rental car coverage since he was without his vehicle, which Kia also declined. Kia also informed Plaintiff Stanczak that the long block for his vehicle was actually no longer in production and, as a result, they needed to order a used long block.

24.     Roseville Mitsubishi-Kia quoted Plaintiff Stanczak approximately $3,200 for the used engine. Plaintiff Stanczak inquired where it was ordering the engine from so he could check the price. Upon further investigation, Plaintiff Stanczak found that the price for the engine was actually $2,210 and that the dealership was attempting to charge him a $1,000 "finder's fee" on the engine.

25.    Plaintiff Stanczak purchased the engine himself from Kia's source and had it shipped to the dealership. Plaintiff Stanczak paid Roseville Mitsubishi-Kia approximately $1,980.00 for labor to install the used engine in his vehicle.

26.    At all times relevant herein, Plaintiff Stanczak adhered to Kia's recommended maintenance intervals.

27.    Plaintiff Stanczak has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, diminished value of his vehicle, and other consequential damages.

28.    Neither Defendant, nor any of their agents, dealers, or other representatives informed Plaintiff Stanczak of the existence of the defect prior to, or any time after, his purchase.

**B.    Plaintiff Rose Creps**

29.    Plaintiff Rose Creps is a citizen of the State of Maine, and currently resides in Auburn, Maine.

30.    On or about April 21, 2015, Plaintiff Creps purchased a new Kia Optima EX (VIN: 5XXGN4A79FG394415) from Rowe Kia Auburn, an authorized Kia dealership located in Auburn, Maine.

31.    In or about July 23, 2016, with approximately 43,473 miles on the odometer, while accelerating to merge onto a highway, Plaintiff Creps heard a loud banging noise originating from the engine. Plaintiff Creps immediately pulled over and called Rowe Kia Auburn and made an appointment to bring her vehicle in so the dealership could evaluate it.

32.    The dealership informed Plaintiff Creps that her PCV valve "was bad" and needed to be replaced. The dealership also informed Plaintiff Creps that they found sludge in the engine oil. Plaintiff Creps requested warranty repairs and the dealership informed her that the PCV valve would be replaced under Kia's warranty but that it

would not "clean the engine" of the sludge under the warranty and required Plaintiff Creps to pay approximately $294.71 for this service, which Plaintiff Creps paid.

33.    In or about early August 2016, Plaintiff Creps was driving her vehicle in New Jersey before a flight when she accelerated to merge across traffic when her vehicle again made a loud knocking noise when accelerating before it shut off entirely while Plaintiff Creps was operating it. Plaintiff Creps had it towed to a Kia dealership in New Jersey who examined her vehicle, filled it with oil, and instructed her to drive it back to her dealership in Auburn, Maine, which Plaintiff Creps did.

34.    Plaintiff Creps brought her vehicle to Rowe Kia Auburn in or about August 8, 2016, with approximately 44,688 miles on the odometer, and requested free repairs under the terms of Kia's warranties. The dealership informed Plaintiff Creps that her engine needed to be replaced. The dealership also informed Plaintiff Creps that she needed to produce documentation for all oil changes in order to receive warranty repairs, otherwise she would be required to pay out of pocket for any repairs.

35.    At all times relevant herein, Plaintiff Creps adhered to Kia's recommended maintenance intervals. Plaintiff Creps, however, did not keep receipts of each oil change. Upon contacting the independent repair shop that Plaintiff Creps used for her oil changes, the repair shop was only able to locate receipts for two of her oil changes but, because the repair shop did not keep electronic records, it was unable to provide Plaintiff Creps with receipts for all of her oil changes.

36.    Plaintiff Creps brought her receipts to the dealership, which denied her warranty claim, and quoted her approximately $5,324.21 in parts and labor for an engine replacement.

37.    Plaintiff Creps then contacted Kia's corporate office and again requested warranty repairs. Kia corporate denied her request but offered her a payment of approximately $1,200.00 as a goodwill gesture, which Plaintiff Creps declined.

38.    During this time, Plaintiff Creps was unable to drive her vehicle and paid approximately $576.93 for a rental car from August 8, 2017, until August 26, 2016.

-8-

39.     After being denied warranty repairs by both Rowe Kia Auburn and Kia's corporate office, Plaintiff Creps was forced to pay the $5,324.21 to replace her engine because Plaintiff Creps needed a working vehicle.

40.     Plaintiff Creps has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, diminished value of her vehicle, and other consequential damages.

41.     Neither Defendant, nor any of their agents, dealers, or other representatives informed Plaintiff Creps of the existence of the defect prior to, or any time after, her purchase.

## C.     Defendant KMA

42.     Defendant KMA is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. Furthermore, Defendant KMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Class Vehicles.

43.     Defendant KMA is incorporated and headquartered in the state of California with its principal place of business at 111 Peters Canyon Road, Irvine, California 92606. KMA is the U.S. sales and marketing division, which oversees sales and other operations across the United States. KMA distributes Kia vehicles and sells these vehicles through its network of more than 700 dealerships. Money received from the purchase of a Kia vehicle from a dealership flows from the dealer to KMA.

44.     Upon information and belief, the distribution, service, repair, installation, and decisions regarding the GDI Engine as it relates to the engine defect within the Class Vehicles were performed exclusively by Defendant KMA.

45.     Upon information and belief, Defendant KMA developed the post-purchase owner's manuals, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles.

46.     KMA engages in continuous and substantial business in California.

47.     The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such defendants by such fictitious names. Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the defendants designated herein as DOES when such identities become known.

48.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## **CALIFORNIA LAW APPLIES**

49.     It is appropriate to apply California law to the nationwide claims because California's interest in this litigation exceeds that of any other state.

50.     As discussed above, Defendant KMA is located in Irvine, California and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting Kia vehicles.

51.     KMA's customer relations, engineering, marketing, and warranty departments are all located in KMA's Irvine campus. KMA's customer service complaint address is Kia Motors America Consumer Affairs Department, P.O. Box 52410, Irvine, California 92619-2410. KMA's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to Kia or third-party websites. KMA's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from KMA's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.

52.     Based on the foregoing, such policies, practices, acts, and omissions giving rise to this action were developed in, and emanated from, Defendant's headquarters in Irvine, California. As detailed below, KMA also came to know, or should have come to know, of the engine defect through the activities of KMA divisions and affiliated entities located within California. Accordingly, the state of California has the most significant relationship to this litigation and its law should govern.

## TOLLING OF STATUTES OF LIMITATIONS

53.     Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the engine defect until shortly before this class action litigation was commenced.

54.     In addition, even after Plaintiffs and Class Members contacted KMA and/or its authorized dealers for vehicle repairs concerning the engine defect, they were routinely told by Defendant and/or through its dealers that the Class Vehicles were not defective. As described below, the true cause of the premature and catastrophic failure in the Class Vehicles is a defect that results in restricted oil flow.

55.     Defendant KMA was and remains under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the manufacturing defect will result in restricted oil flow and catastrophic engine failure, that they will require costly repairs, pose safety concerns, and diminish the resale value of the Class Vehicles. As a result of the active concealment by Defendant KMA, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**A.     The Defective Engine Components within the Class Vehicles**

56.     Kia Motors Corporation ("KMC"), one of the leading motor vehicle manufacturers in Korea, was established in December 1944 under the laws of the Republic of Korea to manufacture and sell a range of passenger cars, recreational

-11-

1   vehicles and other commercial vehicles in the domestic and international markets. As of
2   December 31, 2016, Kia Motors Corporation's largest shareholder is Hyundai Motor
3   Company, which holds 33.88 percent of KMC's stock.[2] Hyundai Motor Company
4   ("HMC") is a multinational corporation with over 75,000 employees worldwide. HMC is
5   currently the fourth largest automobile manufacturer in the world.

6       57.     KMA is the American sales, marketing, and distribution arm of KMC. KMA
7   offers a complete line of vehicles through more than 755 dealers throughout the United
8   States.

9       58.     According to its website, Hyundai builds the Theta 2.4 liter 4-cylinder
10  Gasoline Direct Injection and Theta 2.0 liter 4-cylinder Turbo engines. As a result,
11  "[c]astings of engine blocks, heads and crankshafts are delivered from suppliers and
12  machined to HMMA's exact specifications."[3]

13      59.     Upon information and belief, certain GDI Engines, which KMC and
14  Defendant KMA used in the Class Vehicles, were manufactured by Hyundai.

15          **1.    The GDI Engines**

16      60.     The Theta 2.0 liter and 2.4 liter engines contained in the Class Vehicles
17  contain a gasoline direct-injection ("GDI") fuel delivery system. Kia advertises that
18  "[i]t's the Gasoline Direct Injection engine that helps a Kia deliver outstanding
19  performance—in both power and fuel use. GDI injects highly-pressurized fuel directly
20  into the cylinders during the engine's combustion cycle. The result is an increased quality
21  of combustion and efficiency. By making smarter use of fuel, GDI also reduces
22  emissions. What the driver experiences is still the most critical element of any powertrain
23  technology. And with GDI, the driver enjoys smooth, powerful acceleration and a longer
24  time between refueling."

25
26  _____
27  [2] http://www.kia.com/worldwide/about_kia/investor_relations/annual_report.do (2016 Annual Report,
    pg. 67) (last visited August 7, 2017).
28  [3] https://www.hyundaiusa.com/about-hyundai/news/Corporate_newengine-20091120.aspx (last visited
    August 7, 2017).

Class Action Complaint
Case No. 8:17-cv-1365

61.     Hyundai has also made similar public statements regarding the design of the GDI engine: "[t]his shorter, more direct path of fuel delivery, allows for greater control of the fuel mixture at the optimum moment, thus improving efficiency. The fuel is injected by a camshaft-driven, high pressure pump that operates at pressures up to 2,175 psi. Direct injection also utilizes a higher than normal 11.3:1 compression ratio for increased power. The pistons are 'dished' to increase combustion efficiency in the cylinder. This powerplant delivers best-in-class fuel economy, best-in-class four-cylinder horsepower and best-in-class torque."

62.     As background, the GDI Engines contained in the Class Vehicles use four reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. And fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back up, forcing the exhaust gases out of the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of Combustion Cycle is below:



-13-

Class Action Complaint
Case No. 8:17-cv-1365

63.     The pistons are connected to the crankshaft via the connecting rod.  As the connecting rod moves up and down during the Combustion Cycle, this causes the crankshaft to rotate, ultimately resulting in power to the drive wheels of the vehicle. During this cycle, the crankshaft rotates many thousands of times per minute within each connecting rod.  In order to reduce friction and prolong longevity, this design utilizes a bearing placed between the connecting rod and crankshaft surfaces.  As a result, the connecting rod bearings allow the crankshaft to rotate within the connecting rods during the Combustion Cycle.  An exemplar diagram of the piston, connecting rod, connecting rod bearing and crankshaft are shown below:



Figure 3-70.—Connecting rod bearings.

64.     When the Class Vehicles are in operation, engine oil is used to lubricate the piston, cylinder wall, connecting rod bearings and other rotating and moving components as the piston moves up and down through the four-stroke sequence. Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing,

-14-

and cool the engine by carrying away heat from the moving parts. Engine oil also cleans and transports contaminants away from the engine to the engine oil filter. Oil is pumped and pressurized throughout the engine by the oil pump. The oil pump draws oil from the oil pan, located underneath the piston and crankshaft. The oil pump forces engine oil through the oil filter and then through passages in the engine to properly lubricate and reduce friction in internal moving engine components. The oil then returns to the oil pan through small drainage holes located throughout the engine where it will be recirculated by the oil pump. Below is a diagram illustrating the typical path and channels of engine oil lubrication in an overhead cam engine:



65.     The connecting rod bearings are also lubricated with engine oil in order to allow the crankshaft to rotate within the connecting rods.  A close up picture of a functional connecting rod bearing is below:

Class Action Complaint
Case No. 8:17-cv-1365

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15          **2.      Previous GDI Engine Recalls**

16      66.     On or about September 20, 2015, Hyundai Motor America recalled certain

17  model year 2011-2012 Sonata vehicles manufactured at Hyundai Motor Manufacturing

18  Alabama and equipped with the 2.4L and 2.0T GDI Engines. (*See* Exhibit 1.)

19      67.     According to the Hyundai GDI Recall, Hyundai determined that metal

20  debris may have been generated from factory machining operations as part of the

21  manufacturing of the engine crankshaft during December 11, 2009, to April 12, 2012.

22  As a result, and according to the Hyundai GDI Recall:

23              [i]f the debris is not completely removed from the crankshaft's
               oil passages, it can be forced into the connecting rod oiling
24             passages restricting oil flow to the bearings.  Since bearings are
               cooled by oil flow between the bearing and journal, a reduction
25             in the flow of oil may raise bearing temperatures increasing the
               potential of premature bearing wear.  A worn connecting rod
26             bearing will produce a metallic, cyclic knocking noise from the
               engine which increases in frequency as the engine rpm
27             increases.  A worn connecting rod bearing may also result in
               illumination of the oil pressure lamp in the instrument cluster.
28             If the vehicle continues to be driven with a worn connecting rod

Class Action Complaint
Case No. 8:17-cv-1365

bearing, the bearing can fail, and the vehicle could stall while in motion.

68.     Hyundai went on the explain, in Safety Recall Report 15V-568, that it became aware of engine-related warranty claims in the field. Furthermore, "[t]he vast majority of those claims evidenced that customers were responding to substantial noise, or the vehicle's check engine light, and bringing their vehicles to service as a result of those warnings. Many customers also complained after the warranty was no longer available."

69.     In or around September 2, 2015, Hyundai decided to issue a safety recall for approximately 470,000 model year 2011-2012 Sonata vehicles manufactured December 11, 2009, to April 12, 2012, at Hyundai Motor Manufacturing Alabama and equipped with either a 2.0 liter or 2.4 liter Gasoline Direct Injection engine. (*See* Exhibit 2.)

70.     The recall provided notification to owners of the issue, inspection, and replacement of the engine assembly, as necessary, free of charge. Additionally, Hyundai increased the warranty for the engine sub-assembly (short block) to 10 years/120,000 miles for both original and subsequent owners.

71.     In April 2017, Hyundai and Kia announced that they were recalling an additional 1.4 million vehicles with the GDI Engines because it received widespread reports that the engines could fail and stall, *i.e.* the same reason for the first recall. This recall included the 2013-2014 Hyundai Santa Fe, 2011-2014 Kia Optima, 2011-2013 Kia Sportage, 2012-2014 Kia Sorento.

72.     The Class Vehicles have not been recalled despite having the same engine and Plaintiffs and Members of the Class notifying Kia about their engines stalling and failing while being operated.

### 3.     Engine Failures within the Class Vehicles

73.     Upon information and belief, the connecting rod bearings in the GDI Engines undergo a prolonged failure as metal debris circulates throughout the engine via the engine oil. Over time, and as a result of these contaminates in the oiling system,

-17-

the connecting rod bearings begin to fracture. Once the connecting rod bearings fracture, large amounts of metal debris begin to accumulate in the engine oil. As a result, the oil becomes so contaminated with metal debris that the oil filter can no longer remove the plethora of contaminates and maintain the necessary oil pressure within the engine. This contaminated engine oil is recirculated throughout the engine by the oil pump, causing damage to the various engine components and eventually results in sudden and unexpected catastrophic engine failure. If the vehicle is being operated on the highway at the time of the engine failure, it will ultimately result in a high-speed stalling event.

74.    Additionally, as the connecting rod bearings continue to fracture, the acceptable tolerances between the bearings, the connecting rod, and the crankshaft rapidly deteriorate. Eventually, the Class Vehicles begin producing a "knocking" sound originating from the engine as a result of the deteriorating bearings. In some instances, the defective connecting rod bearings may eventually cause the piston to break through the engine block as a result of the deterioration.

75.    A photograph of a fractured connecting rod bearing removed from a GDI Engine is included below. As shown in the photograph, the bearing has fractured and worn away to the point of laying flush along the inside of the connecting rod. A large fracture is also plainly visible along the bottom left side of the bearing.



Class Action Complaint
Case No. 8:17-cv-1365

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

76.     After the connecting rod bearings fail and metal debris is circulated throughout the engine via the engine oil, damage is caused to other key engine components. As pictured below, the main cap – which fastens the crankshaft to the engine – can also be damaged by the metal debris in the engine oil. After the main cap is damaged, play between the main cap and engine develops, which also leads to catastrophic engine failure.



77.     As a result of the defect, the Class Vehicles suffer from restricted and inadequate engine oil lubrication. As explained above, engines are designed to have oil distributed throughout the engine through lubrication channels. When operating properly, the engine oil is distributed throughout the engine by the oil pump and then flows back to the oil pan where it is redistributed throughout the engine.

78.     In the Class Vehicles, the lubrication channels become clogged and restricted as a result of the defect, even under normal use and proper maintenance. When the lubrication channels clog, engine oil is unable to be both pumped throughout the engine (through the oil pump) and is also unable to adequately return to the oil pan, causing a condition known as oil starvation. This results in insufficient lubrication

Class Action Complaint
Case No. 8:17-cv-1365

throughout the Class Vehicle's engine, which causes premature wear of the engine components and catastrophic engine failure.

79.     The engine defect poses serious safety and security issues for operators and occupants of the Class Vehicles. By way of example, the California Department of Motor Vehicles asserts that stalled engines pose a significant safety risk and, as part of its safety curriculum, instructs how to properly respond to a stalled action in order to avoid further risk of injury.

80.     NHTSA takes a similar view of engine failure during vehicle operation. For instance, according to *Forbes*, in 2011 the NHTSA recalled certain Chrysler and Dodge vehicles due to "engine seizure because of connecting rod bearing failure . . . . Engine seizure could increase the risk of a crash."[4]

81.     Defendant KMA failed to adequately research, design, test, and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

**B.     Defendant KMA's Knowledge of the Engine defect**

82.     Plaintiffs' experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same engine defect within the Class Vehicles and complaints from earlier model year Kia owners and lessees with the same engines. Upon information and belief, Defendant KMA, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal durability testing, and (6) other various sources, were well aware of the engine defect but failed to notify consumers of the nature and extent of the problems with the GDI Engines or provide any adequate remedy.

---

[4] http://www.forbes.com/sites/altheachang/2011/09/30/engine-problems-prompt-chrysler-recalls/ (last visited August 7, 2017).

Class Action Complaint
Case No. 8:17-cv-1365

83.     KMA routinely monitors the internet for complaints similar in substance to those quoted below. KMA's customer relations department routinely monitors the internet for customer complaints, and KMA has retained the services of third-parties to do the same. Further, the customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects. Through these sources, KMA was made aware of the engine defect. The complaints also indicate KMA's knowledge of the defect and its potential danger.

84.     KMA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, KMA likely conducts testing on incoming batches of components, including the GDI Engine, to verify that the parts are free from defects and comply with KMA's specifications. Accordingly, KMA knew or should have known that the engine used in the Class Vehicles is defective and likely to fail prematurely, costing Plaintiffs and Class Members thousands of dollars in expenses.

85.     Moreover, KMA also should have known of the connecting rod bearing defect and insufficient lubrication channels because of the sheer number of reports of engine problems relating to the connecting rod bearings and/or lubrication channels. For instance, KMA's customer relations department, which interacts with Kia-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings and lubrication channels. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

86.     KMA's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. KMA dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide KMA with detailed documentation

of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case KMA later determines to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to KMA because KMA will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

87.   KMA knew or should have known about the engine defect because of the high number of replacement parts likely ordered from KMA. All Kia service centers are required to order replacement parts, including engines, piston assemblies, and connecting rod bearings directly from KMA. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from KMA. KMA routinely monitor part sales reports, and are responsible for actually shipping parts requested by dealerships and technicians. Thus, KMA has detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The sudden increase in orders for the GDI Engines and engine components used in the Class Vehicles was known to KMA, and should have alerted it to the scope and severity of the engine defect.

88.   In February 2012, KMA issued a technical service bulletin ("TSB") to its authorized dealerships regarding an engine knocking noise. TSBs are documents used by automotive manufacturers to inform dealership technicians about new information, including vehicle problems, new repair procedures, and improved parts. In TSB No. ENG114R1, KMA acknowledged that the earlier model years of the Class Vehicles with identical engines were defective and experienced a "knocking noise." As a result, KMA directed dealers to blame the engine defect on the use of aftermarket oil filters and instructed the dealers to replace the aftermarket oil filter with a genuine Kia oil filter. The TSB also explained that this "repair" is not covered under warranty. KMA has failed to provide any post-sale notification to owners and lessees regarding the use of only genuine Kia oil filters in the Class Vehicles. Instead, KMA attempts to circumvent warranty obligations related to the engine defect by faulting customers for use of an aftermarket oil

Class Action Complaint
Case No. 8:17-cv-1365

filter. The defective connecting rod bearings and oil lubrication channels are not, however, caused by the use of an aftermarket engine oil filter. Despite KMA's knowledge of this fact, KMA has not informed Plaintiffs of the true cause of the defective connecting rod bearings and insufficient oil lubrication channels.

### 1.    Complaints by Other Class Members

89.    Representative examples of complaints on the NHTSA website regarding the Class Vehicles are included below (with emphasis supplied in capitalized bold, underlined letters)[5]:

### a.    KIA GDI Engine Complaints

Vehicle: 2015 Kia Optima
Date Complaint Filed: 05/10/2017
Date of Incident: 04/28/2017
Component(s): ENGINE
NHTSA ID Number: 10984694
    **SUMMARY**:
    ENGINE LOCKED UP DURRING ACCELERATION
    TO 40 MPH WHY MERGING INTO TRAFFIC
    FOUND OUT ENGINE HAS A BENT ROD. OIL AND
    COOLENT WHERE SUFFICINT BUT KIA WILL NOT
    FIX OR REPLACE. COULD OF CAUSED MY WIFE
    TO CRASH OR BE HIT BY TRAFFIC

Vehicle: 2015 Kia Optima
Date Complaint Filed: 05/03/2017
Date of Incident: 11/26/2016
Component(s): ENGINE
NHTSA ID Number: 10983354
    **SUMMARY**:
    ENGINE LIGHT CAME ON, THEN THE OIL LIGHT.
    I STOPPED TO CHECK OIL. THERE WAS NO OIL
    ON THE DIPSTICK. I CHECKED FOR LEAKS.
    FOUND NONE. I ADDED 2 QUARTS. THE ENGINE

[5] The foregoing complaints are reproduced as they appear on the NHTSA website. Any typographical errors are attributable to the original author of the complaint.

-23-

WAS KNOCKING. I TOOK IT TO THE
DEALERSHIP. MY CAR WAS UNDER WARRANTY.
BUT WOULDN'T REPLACE IT. IT WOULD COST
ME $7200. SO I TRIED TO DRIVE IT HOME, AND IT
QUIT.THE ENGINE SHUT DOWN. I HAD TO HAVE
IT TOWED HOME. THIS WAS IN NOVEMBER 2016.
AND IT IS STILL DOWN. THEN I HEARD KIA IS
GETTING A CLASS ACTION LAWSUIT AGAINST
THEM, FOR OIL FLOW ISSUES. I'M STILL PAYING
ON THE CAR. I FINANCED THROUGH MY CREDIT
UNION. SO THEY ALREADY GOT THERE MONEY.
I THINK THAT IS WHY THEY ARE SCREWING ME
OVER. TO BE CLEAR I HAD JUST LEFT THE
DEALERSHIP WHEN IT QUIT. IT NEVER MADE A
SOUND, THE DEALERSHIP HAD IT 3 DAYS.

Vehicle: 2015 Kia Optima
Date Complaint Filed: 01/09/2017
Date of Incident: 11/01/2016
Component(s): ENGINE
NHTSA ID Number: 10943930
**SUMMARY**:
2015 KIA OPTIMA WAS OUT OF OIL @ 22,000
MILES AND NO INDICATOR LIGHT HAD GONE
ON WHEN IT WAS TAKEN TO AN OIL CHANGE.
THE OIL CHANGE PLACE WAS THE ONE THAT
INDICATED THAT THE VEHICLE HAD NO OIL IN
IT. IT STARTED MAKING SOME RATTLING NOISE
SPECIALLY GOINT UPHILL SO I TOOK IT IN TO
KIA SERVICE DEPARTMENT. THEY DIAGNOSED
IT WITH "SLUDGE" IN THE ENGINE AND ENGINE
WOULD HAVE TO BE REPLACED. I HAD TO
PROVE 3 PREVIOUS RECEIPTS OF OIL CHANGES
OTHERWISE THE WARRANTY WOULD NOT
COVER IT. I DO NOT HAVE THOSE RECEIPTS
AND 16 DAYS LATER TOOK IT TO THE SAME
PLACE I DID MOST RECENT OIL CHANGE
BECAUSE OIL LIGHT HAD TURNED ON. THE
VEHICLE AGAIN HAD NO OIL IN IT. THE TOPPED

-24-

IT OFF BUT MENTIONED THAT IT WAS NOT
NORMAL FOR SUCH A RECENT MODEL TO BE
BURNING OIL. VEHICLE IS STILL RUNNING BUT
MAKES RATTLING NOISE ONCE IN A WHILE,
PRODUCES WHITE SMOKE OUT OF EXHAUST
PIPE AND I HAVE TO PUT OIL IN IT EVERY
COUPLE OF DAYS. I CANNOT AFFORD TO BUY A
NEW ENGINE. I AM A SINGLE MOM AND NEEDS
A RELIABLE VEHICLE TO GET TO WORK.

Vehicle: 2015 Kia Optima
Date Complaint Filed: 11/03/2016
Date of Incident: 11/02/2016
Component(s): ENGINE
NHTSA ID Number: 10923952
   **SUMMARY**:
   THE VEHICLE WAS IN MOTION AND HAD AN OIL
   CHANGE THE PREVIOUS DAY. THE VEHICLE
   LOST POWER AND AN AUDIBLE CLICKING OR
   TAPPING NOISE CAME ON WHILE DRIVING ON
   THE HIGHWAY. MY WIFE HAD JUST ENOUGH
   TIME TO PULL OFF INTO A LOCAL BUSINESS
   AND PARKED THE CAR. I TOOK IT TO KIA AND
   THEY ADVISED THERE WAS "SLUDGE" IN THE
   ENGINE AND WE HAD NOT BEEN MAINTAIN THE
   VEHICLE PROPERLY. OFFERED TO PRODUCE
   RECORDS BUT THEY ADVISED THEY STILL
   WOULD NOT COVER IT. *TR

Vehicle: 2015 Kia Optima
Date Complaint Filed: 09/29/2016
Date of Incident: 07/22/2016
Component(s): ENGINE
NHTSA ID Number: 10910586
   **SUMMARY**:
   ENGINE FAILURE AT 15 MONTHS OLD AND
   42,000 MILES. KIA DENIED WARRANTY

-25-

COVERAGE BECAUSE I COULD NOT PROVE OIL
CHANGES. SAME COMPLAINT AS THOUSANDS
OF OTHER KIA VEHICLES, HAPPENED
ABRUPTLY, CAR STARTING MAKING LOUD
RATTLING NOISE ON ACCELERATION WHILE
DRIVING, NO WARNING, SLUDGE IN ENGINE. I
HAD TO PAY OUT OF POCKET FOR A NEW
ENGINE TO BE INSTALLED WITH NO
ASSISTANCE FROM KIA OR MY LOCAL
DEALERSHIP.

Vehicle: 2015 Kia Optima
Date Complaint Filed: 09/09/2016
Date of Incident: 06/10/2016
Component(s): ENGINE
NHTSA ID Number: 10905150
    **SUMMARY**:
    MY 2015 KIA OPTIMA HAS 23000 MILES.. I
COULDN'T REMEMBER WHEN I HAD THE OIL
CHANGED,BUT I WAS DRIVING ON 75 COMING
FROM FLA. THE AC STOP WORKING AND THEN
SHORTLY AFTER THAT THE CAR STARTED TO
SLOW DOWN. IT FINALLY CAME TO A
COMPLETE STOP, WHEN I GOT IT TO THE KIA
DEALERSHIP THEY INFORMED ME THAT THE
ENGINE HAD SEIZED .BECAUSE THE SAID I
COULD NOT PROVE THAT THE OIL HAD BEEN
CHANGED,THE WARRANTY WOULD NOT COVER
IT. I BOUGHT THE CAR BRAND NEW. ONLY HAD
IT 15 MONTHS. THERE WAS NO WARNING
LIGHTS OR ANY SIGNS OF TROUBLE .KIA WILL
NOT FIX IT, THEY WANT ALMOST 8.000 TO PUT
IN A NEW ENGINE.

Vehicle: 2015 Kia Optima
Date Complaint Filed: 09/07/2016
Date of Incident: 09/04/2016

Component(s): ENGINE
NHTSA ID Number: 10904330
**SUMMARY**:
AS I WAS DRIVING MY 2015 OPTIMA TO THE
STORE MY CHECK ENGINE LIGHT CAME ON.
THE NEXT DAY I STARTED MY CAR AND HEARD
A RATTLING OR TICKING SOUND, THIS WAS ON
LABOR DAY, SO I TURNED MY CAR OFF AND
CALLED THE DEALERSHIP. DUE TO HOLIDAY
THE SERVICE DEPT WAS NOT OPEN. I CALLED
THEM AGAIN ON TUESDAY SEPT 6TH AND WAS
ADVISED THEY WOULD HAVE IT TOWED. I
RECEIVED A PHONE CALL ON TUESDAY
EVENING STATING MY MOTOR HAS SLUDGE
AND NEEDS TO BE REPLACED.

Vehicle: 2015 Kia Optima
Date Complaint Filed: 09/06/2016
Date of Incident: 09/03/2016
Component(s): ENGINE
NHTSA ID Number: 10904201
**SUMMARY**:
2015 KIA OPTIMA, ONLY 47K MILES....ENGINE
FAILURE...THE DEALERSHIP SAYS ITS SLUDGE...
AND I HAVE TO PROVIDE ALL MY
MAINTENANCE RECORDS. IT STARTED WITH
WHITE SMOKE COMING OUT OF THE TAILPIPE
AND LOUD RATTLING NOISE WHEN I
ACCELERATED, THEN THIS PAST SATURDAY, IT
STARTED TO SHAKE VIOLENTLY AND THE
CHECK ENGINE LIGHT WENT ON . I HAD TO GET
IT TOWED. THIS IS KIA'S FAULT!!! NOT MINE.
I'VE DONE THE SAME ROUTINE MAINTENANCE
ON MY TOYOTA AND HONDA WHICH HAD OVER
100K MILES WITH NO PROBLEMS! I AM BEING
TOLD BY KIA THAT IT WON'T BE COVERED
UNDER THE WARRANTY.

Class Action Complaint
Case No. 8:17-cv-1365

Vehicle: 2015 Kia Optima
Date Complaint Filed: 06/15/2016
Date of Incident: 06/04/2016
Component(s): ENGINE
NHTSA ID Number: 10874312
**SUMMARY**:
MY 2015 KIA OPTIMA HAS 26,456 MILES. THE
LAST OIL CHANGE WAS PERFORMED AT 26,064
MILES. ON 6/4/16 WHILE DRIVING APPROX.
50MPH IN 3 LANE TRAFFIC THE ENGINE SEIZED
UP, CAR SHUT DOWN AND INTERIOR FILLED
WITH SMOKE. HAD VEHICLE TOWED TO KIA.
WAS TOLD IT NEEDS A NEW ENGINE DUE TO
SLUDGE IN THE OIL. KIA IS REFUSING TO
HONOR THE WARRANTY BECAUSE I CANNOT
PRODUCE RECEIPTS FOR PREVIOUS OIL
CHANGES. I HAVE RESEARCHED AND MANY
OTHER KIA VEHICLES ARE HAVING VERY
SIMILAR PROBLEMS WITH LOW MILES! THERE
HAS TO BE SOMETHING WRONG THAT KIA IS
NOT AWARE OF OR IS JUST NOT WILLING TO
ADMIT. NOT ONLY WILL THEY NOT FIX MY
VEHICLE BUT I FEAR SOMEONE IS GOING TO
GET HURT OR EVEN KILLED. I INFORMED KIA
OF MY CONCERN BUT THEY DID NOT SEEM TO
CARE.

Vehicle: 2015 Kia Optima
Date Complaint Filed: 05/24/2016
Date of Incident: 10/15/2015
Component(s): ENGINE
NHTSA ID Number**:** 10870505
**SUMMARY**:
TL* THE CONTACT OWNS A 2015 KIA OPTIMA.
WHILE DRIVING 60 MPH, SMOKE EMITTED FROM
THE ENGINE COMPARTMENT WITHOUT
WARNING. THE VEHICLE WAS TAKEN TO THE
DEALER. THE TECHNICIAN DIAGNOSED THAT

-28-

THE NUMBER TWO CYLINDER WAS DEFECTIVE
AND NEEDED TO BE REPLACED. THE VEHICLE
WAS NOT REPAIRED. THE FAILURE MILEAGE
WAS 58,000.

### b. Previous Model Year Kia GDI Engine Complaints

Vehicle: 2011 Kia Optima
Date Complaint Filed: 10/16/2014
Component(s): ENGINE
Date of Incident: 10/12/2014
NHTSA ID Number: 10645013
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGN4A61B5 . . .

**SUMMARY:**
TL* THE CONTACT OWNS A 2011 KIA OPTIMA.
THE CONTACT STATED THAT **WHILE DRIVING
75 MPH AT NIGHT WITH THE CRUISE
CONTROL ACTIVATED, THERE WAS SMOKE
COMING FROM UNDER THE HOOD AND THE
VEHICLE ENGULFED INTO FLAMES.** THE FIRE
DEPARTMENT EXTINGUISHED THE FIRE. A
POLICE/FIRE REPORT WAS FILED AND THERE
WERE NO INJURIES REPORTED. THE VEHICLE
WAS DESTROYED AND THE CAUSE OF THE FIRE
WAS NOT DETERMINED. THE MANUFACTURER
WAS NOT MADE AWARE OF THE FAILURE. THE
FAILURE MILEAGE WAS 51,500.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 04/16/2015
Date of Incident: 03/31/2015
Component(s): ELECTRICAL SYSTEM, ENGINE
NHTSA ID Number: 10706020
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGN4A72B5 . . .

**SUMMARY:**
TL* THE CONTACT OWNS A 2011 KIA OPTIMA.
**WHILE TRAVELING AT APPROXIMATELY 50
MPH AND ATTEMPTING TO SLOW DOWN FOR
A STOP LIGHT, THE VEHICLE STALLED
WITHOUT WARNING AND FAILED TO
RESTART.** THE VEHICLE WAS TOWED TO AN
AUTHORIZED DEALER WHO DIAGNOSED THAT
THE STARTER BURNED OUT AND THAT THE
ENGINE SEIZED. THE DEALER REPLACED THE
STARTER AND WAS NOT ABLE TO DIAGNOSE
THE SOURCE OF THE FAILURE. THE CONTACT
WAS INFORMED THAT A MORE EXTENSIVE
DIAGNOSIS WAS REQUIRED AND THE ENGINE
NEEDED TO BE TAKEN APART. THE ENGINE

-29-

Class Action Complaint
Case No. 8:17-cv-1365

1  FAILURE WAS NOT REPAIRED BY THE DEALER.
   THE VEHICLE WAS NOT ABLE TO BE DRIVEN.
2  THE MANUFACTURER WAS NOTIFIED OF THE
   FAILURE. THE FAILURE MILEAGE WAS NOT
3  AVAILABLE.

4

5  Vehicle: 2011 Kia Optima
   Date Complaint Filed: 05/29/2015
6  Date of Incident: 05/27/2015
   Component(s): ENGINE. SERVICE BRAKES
7  NHTSA ID Number: 10722186
   Manufacturer: Kia Motors America
8  Vehicle Identification No. (VIN): KNAGM4A7XB5 . . .

9  **SUMMARY:**
   I HAVE A 2011 KIA OPTIMA LX. 2.4 LITER
10 ENGINE. ALWAYS KEEP UP ON THE
   MAINTENANCE AND OIL CHANGES. CAR IS IN
11 GREAT SHAPE. I WAS NOT EXPERIENCING ANY
   ISSUES. WARNINGS. NO CHECK ENGINE/OIL
12 LIGHTS. NO NOISES. ABSOLUTELY NOTHING.
   **THEN LAST NIGHT MY CAR JUST SPUTTERED**
13 **AND CUT OFF WHILE BEING DRIVEN.**
   **APPARENTLY WHEN THE ENGINE CUTS OFF.**
14 **SO DOES THE BRAKES. THERE WAS NO WAY**
   **TO PUSH THE BRAKES. SO I HAD TO TRY TO**
15 **SAFELY COAST TO THE SIDE OF THE ROAD.**
   **WITH NO BRAKES AND NO POWER STEERING.**
16 I FINALLY PULLED OVER. TRIED TO RESTART
   THE CAR AND THERE WAS SUCH A LOUD
17 KNOCKING NOISE. AND SOME SOUEALING
   NOISES AS WELL. THE CAR WILL NO LONGER
18 START EITHER. I HAD A MECHANIC LOOK AT IT
   TODAY AND SAYS THE ENGINE IS "JUST GONE."
19 NO EXPLANATIONS AT ALL. I VERIFIED THAT
   THE KIA OPTIMA AND THE HYUNDAI SONATA
20 ARE THE SAME MANUFACTURER AND USE THE
   SAME ENGINES. I SEE THERE ARE WAY MORE
21 COMPLAINTS ABOUT THE 2011 HYUNDAI
   SONATA WITH THIS SAME ISSUE. I WILL TRY TO
22 NOTIFY KIA AND SEE IF THEY ARE WILLING TO
   STEP UP AND CORRECT THIS EVEN WITH THE
23 WARRANTY EXPIRING 7.000 MILES AGO. SINCE I
   AM THE SECOND OWNER. I HAVE FOUND MANY
24 COMPLAINTS ABOUT THIS SAME THING FOR
   BOTH THE 2011 OPTIMAS AND SONATAS. THIS IS
25 SO DANGEROUS BECAUSE THERE ARE NO
   WARNINGS. AND THE ENGINE CUTS OFF IN
26 TRAFFIC. WHICH ALSO CAUSES THE BRAKES
   AND STEERING TO GO OUT. NOT SAFE AT ALL.

27

28 Vehicle: 2011 Kia Optima

Date Complaint Filed: 08/24/2015
Date of Incident: 08/24/2013
Component(s): ENGINE
NHTSA ID Number: 10778079
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A7XB5 . . .

**SUMMARY:**
DRIVING DOWN EXPRESS WHEN ENGINE
STARTED TO LOOSE OIL. PULLED OVER ON
SHOULDER. NOTICE A CLICKING NOISE AND
SMELLED BURNING OIL. DEALER FOUND HOLE
IN SIDE OF ENGINE BLOCK. STATED NEEDS NEW
ENGINE AND QUOTED AND ESTIMATED PRICE
OF $5,875.64 FOR A USED ENGINE WITH 46,000
MILES INSTALLED. HAD CAR REPAIRED AT
ANOTHER PLACE FOR $5477.06 WITH 41,000
MILES. THIS SHOP SAID THE ENGINE HAD A ROD
KNOCK THEN LOCKED UP. NEEDS THE ENGINE
REPLACED. **THIS IS THE SAME 2.4 LITER
ENGINE THAT IS BEING RECALLED FOR THE
HYUNDAI SONATAS.**

Vehicle: 2011 Kia Optima
Date Complaint Filed: 09/29/2015
Date of Incident: 06/21/2015
Component(s): ENGINE
NHTSA ID Number: 10778375
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A72B5 . . .

**SUMMARY:**
TL* THE CONTACT OWNS A 2011 KIA OPTIMA.
**WHILE DRIVING AT APPROXIMATELY 40 MPH.
THE CHECK ENGINE WARNING LIGHT
ILLUMINATED. THE DRIVER SHUT OFF THE
VEHICLE AND IT FAILED TO RESTART.** THE
VEHICLE WAS TOWED TO A DEALER WHO
DIAGNOSED THAT THE ENGINE NEEDED TO BE
REPLACED. THE MANUFACTURER WAS
NOTIFIED OF THE FAILURE. THE VEHICLE WAS
NOT REPAIRED. THE FAILURE MILEAGE WAS
71,106.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 11/09/2015
Date of Incident: 10/31/2015
Component(s): ELECTRICAL SYSTEM . ENGINE
NHTSA ID Number: 10789435
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A79B5 . . .

-31-

Class Action Complaint
Case No. 8:17-cv-1365

**SUMMARY:**
**WHILE DRIVING 70 MPH ON THE HIGHWAY MY 2011 KIA OPTIMA ENGINE SHUT DOWN AND WOULD NOT ACCELERATE AND THE BRAKES WOULD NOT FUNCTION.** LUCKILY, I SAFELY MADE IT TO THE FAR SHOULDER OF THE HIGHWAY ONLY TO FIND THAT MY CAR WAS SMOKING AND SMELLED LIKE SOMETHING WAS BURNING. HAD TO GET THE CAR TOWED TO THE DEALERSHIP AND THEY INFORMED THE ENGINE NEEDS TO BE REPLACED AND THE STARTER IS ALSO FRIED. I HAVE SEEN FOUR COMPLAINTS SO FAR OF 2011 KIA OPTIMA'S WITH THE SAME ISSUE AND AM SURE I WILL FIND MORE. THAT SEEMS LIKE TOO MUCH OF A COINCIDENCE THAT IT HAPPENS SO FREQUENTLY WITH THESE MODELS AND THERE ISN'T ANY SORT OF RECALL. NO BREAKS AT 70 MPH IS PRETTY DANGEROUS. I HAVE CONTACTED MY ATTORNEY AND HOPE THIS MANUFACTURER WILL DO THE RIGHT THING.

Vehicle: 2011 Kia Optima
Date Complaint Filed: 12/13/2015
Date of Incident: 12/06/2015
Component(s): ENGINE
NHTSA ID Number: 10809924
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A75B5 . . .

**SUMMARY:**
WAS DRIVING DOWN THE INTERSTATE AND THE CAR DIED AFTER PULLING OFF TO THE SHOULDER TRIED TO START THE CAR AND ALL IT WOULD DO WAS CLICK. TOWED THE CAR HOME THINKING IT WAS AN ALTERNATOR OR SOMETHING SIMPLE. NEXT MORNING LOOKED AT THEN CHANGED THE BATTERY AND TRIED TO GET IT STARTED IN SLIGHTLY TURNED OVER BUT NOT ENOUGH TO START CALLED THE DEALER TO DROP IT OFF AND THEY SAID CAR WAS SEIZED OUT OF WARRANTY AND NEEDS THE ENGINE REPLACED. **AFTER SEARCHING ON THE INTERNET AND LOOKING AT COMPLAINTS FOUND THAT MY ENGINE WAS BUILT AT THE SAME PLANT AS THE HYUNDAI SONATA SAME ENGINE. WHICH IS RECALLED FOR THIS SAME EXACT PROBLEM . I AM WONDERING WHY KIA ACTED LIKE THE CANT BELIEVE THIS WOULD HAPPEN WHEN THESE CARS SHOULD BE RECALLED ALSO** . WHAT CAN BE DONE HERE ? I WILL NOT LET THIS GO IT IS WRONG KIA'S SHOULD BE LOOKED INTO AND RECALLED

-32-

Vehicle: 2011 Kia Optima
Date Complaint Filed: 02/29/2016
Date of Incident: 05/09/2015
Component(s): ENGINE
NHTSA ID Number: 10838965
Consumer Location: SAN ANTONIO. TX
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): KNAGM4A76B5 . . .

**SUMMARY:**
TL-THE CONTACT OWNS A 2011 KIA OPTIMA. **THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 60 MPH, AN ABNORMAL SOUND EMITTED FROM UNDER THE HOOD OF THE VEHICLE AS THE CHECK ENGINE OIL WARNING LIGHT FLICKERED.** THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE IT WAS DIAGNOSED THAT THE CONNECTING ROD FAILED AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 92.000. SS

Vehicle: 2012 Kia Optima
Date Complaint Filed: 09/23/2014
Date of Incident: 09/22/2014
Component(s): ENGINE
NHTSA ID Number: 10638362
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGN4A7XCG . . .

**SUMMARY:**
**DRIVING VEHICLE AT 35-40 MPH. ALL OF A SUDDEN ENGINE STOPPED.** THERE WAS HEAVY SMOKE COMING FROM UNDER THE HOOD AND SMELLED OF AN ELECTRICAL FIRE. SMOKE DISSIPATED AFTER 15 MINUTES. VEHICLE WAS UNABLE TO BE RESTARTED AND HAD TO BE TOWED TO KIA DEALERSHIP IN TURNERSVILLE NJ. SPOKE WITH DEALERSHIP ON 9/23 AND WAS TOLD STARTER AND ENGINE NEEDS TO BE REPLACED. *TR

Vehicle: 2012 Kia Optima
Date Complaint Filed: 09/26/2014
Date of Incident: 09/11/2014
Component(s): ENGINE
NHTSA ID Number: 10639417

-33-

Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): Not Available . . .

**SUMMARY:**
TL* THE CONTACT OWNS A 2012 KIA OPTIMA. **THE CONTACT STATED THAT WHILE DRIVING AT APPROXIMATELY 70 MPH. THE ENGINE STALLED WITHOUT WARNING.** IN ADDITION. A STRONG ELECTRICAL BURNING ODOR EMITTED INSIDE OF THE VEHICLE. THE VEHICLE WAS TOWED TO A DEALER FOR DIAGNOSIS. THE MECHANIC INFORMED THAT THE STARTER AND ASSOCIATED FUSES WERE COMPLETELY BURNT. THE VEHICLE WAS REPAIRED. THE CONTACT STATED THAT AFTER THE REPAIRS WERE PERFORMED. THE VEHICLE FAILED TO START. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHO RECOMMENDED THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE VIN WAS UNAVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 55,000.

Vehicle: 2012 Kia Optima
Date Complaint Filed: 09/30/2015
Date of Incident: 08/02/2015
Component(s): ENGINE
NHTSA ID Number: 10778891
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGN4A76CG . . .

**SUMMARY:**
I WAS DRIVING ON I 95 ON OUR WAY HOME FROM FLORIDA. WE WERE PASSING FAYETTSVILLE .NC WHEN MY CAR ENGINE MADE SOME KNOCKING NOISE AND THEN THE ENGINE LIGHT CAME ON. BEFORE I CAN PULL TO THE SHOULDER. **THE CAR STALLED.LOST POWER AT 70 MLS PER HR. WE WERE LUCKY NO ONE HIT US AS I WAS SLOWLY NAVIGATING TO THE SHOULDER.** I HAD IT TOWED TO A KIA DEALERSHIP IN FAYETTSVILLE.NC. THEY SAID ENGINE SEIZED UP AND NEEDS TO BE REPLACE. THE CAR HAS 71.000MLS BUT KIA DENIED MY WARRANTY CLAIM SO I END UP PAYING $5.700 FOR A REMANUFACTURED ENGINE.

Vehicle: 2012 Kia Optima
Date Complaint Filed: 12/14/2015

Class Action Complaint
Case No. 8:17-cv-1365

Date of Incident: 11/28/2015
Component(s): ENGINE
NHTSA ID Number: 10809989
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGR4A69CG . . .

**SUMMARY:**
THE VEHICLE HIT 63,000 MILES DURING THIS INCIDENT. AS I WAS MERGING ONTO THE EXPRESSWAY AT 50MPH. **I GOT THE VEHICLE TO 60MPH AND THE SPEEDOMETER GAUGE FROZE AT 60MPH. THEN, THE RPM GAUGE DROPPED TO 0. SUDDENLY THE ENGINE LOST POWER. THE BRAKES LOCKED UP AND BEFORE I GOT THE CAR OFF TO THE SHOULDER AT A COMPLETE STOP. THE ENGINE CUT OUT COMPLETELY.** THE ENGINE WOULD NOT START AT ALL AFTER IT CUT OUT. I THEN BROUGHT THE VEHICLE TO A DEALERSHIP WHERE THEY DEEMED A NEW ENGINE AS THE CURRENT ENGINE BLEW.

Vehicle: 2012 Kia Optima
Date Complaint Filed: 01/21/2016
Date of Incident: 01/13/2016
Component(s): ENGINE
NHTSA ID Number: 10821364
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGR4A67CG . . .

**SUMMARY:**
**DRIVING AT APPROXIMATELY 50 MPH ON THE PARKWAY, ENGINE STALLED WITHOUT WARNING AND WOULD NOT RE-START.** I HAD THE CAR TOWED TO A SHOP WHERE THEY INFORMED ME THE ENGINE HAD SEIZED. THERE WAS DEFINITELY OIL IN THERE AS I HAD AN OIL CHANGE WITHIN THE LAST COUPLE OF WEEKS.. THE CAR HAS 72K MILES ON IT AND I AM THE SECOND OWNER SO NOT COVERED BY KIA'S NON-TRANSFERABLE 10YR/100K MI WARRANTY. WORKING WITH KIA CUSTOMER SERVICE. WAITING TO HEAR BACK FROM A SUPERVISOR.

Vehicle: 2013 Kia Optima
Date Complaint Filed: 06/14/2013
Date of Incident: 06/12/2013
Component(s): ENGINE
NHTSA ID Number: 10519827
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGR4A63DG . . .

-35-

**SUMMARY:**
DRIVING ON A CITY ROAD DURING NORMAL
TRAFFIC (4:30PM EST) MY VEHICLE BEGAN TO
MAKE LARGE RATTLING NOISE FROM THE
ENGINE COMPARTMENT. AT FIRST I THOUGHT I
HAD PICKED UP SOMTHING ON THE ROAD. BUT
AS I ACCELERATED/DECCELERATED THE NOISE
BECAME LOUDER/SOFTER. I IMMEDIATLEY
CONTACTED MY KIA DEALERSHIP. AFTER
SPEAKING TO THE SERVICE MANAGER HE TOLD
ME TO BRING THE VEHICLE IN NEXT WEEK
SINCE THAT WOULD BE THE SOONEST IT COULD
BE LOOKED AT. I INFORMED HIM THAT I DID'NT
THINK I COULD EVEN MAKE IT HOME LET
ALONE WAIT A WEEK TO BRING THE VEHICLE
IN. HE STATED I COULD DROP IT OFF. BUT IT
WOULD NOT BE LOOKED AT UNTIL NEXT WEEK.
EITHER WAY. WITHIN 10 MIUTES OF DRIVING A
LARGE BANGING NOISE WENT OFF UNDER THE
HOOD. ENGINE OIL SPRAYED THROUGHT THE
ENGINE COMPARTMENT AND I HAD COMPLETE
LOSS OF POWER. KIA ROADSIDE ASSISTANCE
TOWED THE VEHICLE TO THE DEALERSHIP
WHERE THEY HAVE INFORMED ME THAT THE
ENGINE NEEDS TO BE REPLACED. THE VEHICLE
IS LESS THAN 2 WEEKS OLD AND HAD 600 MILES
WHEN THIS OCCURED. I INFORMED THE
DEALERSHIP I WOULD NOT WANT A VEHICLE
WITH A REPLACED ENGINE AND THEY HAVE
INFORMED ME THAT IS MY ONLY OPTION. I
WILL NOT BE PURCHASING FROM KIA AGAIN AS
THERE WAS NO SUPPORT FROM THEIR
CORPORATE CUSTOMER SERVICE EITHER. *TR

Vehicle: 2013 Kia Optima
Date Complaint Filed: 08/17/2015
Date of Incident: 08/12/2015
Component(s): ENGINE
NHTSA ID Number: 10749310
Manufacturer: Kia Motors America
Vehicle Identification No. (VIN): 5XXGN4A72DG . . .

**SUMMARY:**
THE EVENING OF 8/12/15 **I WAS DRIVING DOWN
A 4 LANE CITY ROAD. 2 LANES EACH
DIRECTION. THE ENGINE COMPLETELY SHUT
OFF LEAVING ME WITH NO POWER AND IN A
VERY DANGEROUS SITUATION WITH SUDDEN
DECELERATION AND VEHICLES COMING UP
FROM BEHIND.** FORTUNATELY. NO ONE HIT ME
AND I WAS ABLE TO MOVE THE CAR OUT OF
TRAFFIC. NO ENGINE MAINTENANCE/WARNING
LIGHTS CAME ON PRIOR TO THE ENGINE
FAILURE. WE HAVE BEEN INFORMED THE

-36-

ENGINE IS LOCKED UP AND WILL NEED
COMPLETELY REPLACE WITH A NEW ENGINE.
ROUTINE MAINTENANCE. INCLUDING KIA'S
22.500 MILE RECOMMENDED MAINTENANCE
WAS PERFORMED ONLY 16 DAYS PRIOR ON
7/27/15. DAVE GREEN. KIA ARAPAHOE SERVICE
MANAGER. INFORMED TODAY (8/17/15) THAT
THEY HAVE SEEN SEVERAL INSTANCES OF THIS
IN THE PAST WEEK. THEY BELIEVE THERE IS A
CONNECTION TO THE HOT WEATHER. WHAT
EVER THE CAUSE THIS HAS A VERY HIGH
POTENTIAL TO CAUSE DEATH OR EXTREME
INJURY

90.     Upon information and belief, KMA regularly monitors these NHSTA databases as part of its ongoing obligation to identify potential defects in its vehicles. NHTSA complaints establish that KMA knew, or should have known, of the engine defect *at least* as early as June 14, 2013, years before the Class Vehicles at issue in this litigation were sold. Upon information and belief, Defendant became aware of the engine defect earlier than June 2013 through: (1) Defendant's own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) durability testing and part sales, and (6) other various sources.

## C.   **KMA's Warranty-Related Practices**

91.     KMA issued two relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty," and a "Powertrain Warranty."

92.     Under the basic New Vehicle Limited Warranty, KMA agreed to repair defects reported within the earlier of 5 years or 60,000 miles.

93.     Under the Powertrain Warranty, KMA agreed to repair defects affecting various powertrain components through 10 years and 100,000 miles. According to the Warranty and Consumer Information Manual, Powertrain Coverage Components include:

**In the Engine:** Cylinder block, cylinder head and all internal parts, timing gear, seals and gaskets, valve cover, flywheel, oil pump, water pump and turbo charger.

**In the Transaxle:** Transmission case and all internal parts, torque converter, drive shafts, universal joints, front hubs, bearings, seals and gaskets.

**In the Transmission**: Transmission case, transfer case, torque converter and all internal parts, seals, and gaskets.[6]

94.     KMA instructs vehicle owners and lessees to bring their vehicles to a Kia dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Kia dealerships with complaints related to the engine defect.

95.     KMA has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by representing that the cause of the defect is the owner's neglect to properly maintain the engine oil and/or engine oil level. This representation, however, is false as the engine is inherently defective and will inevitably fail.

96.     In addition, KMA has also evaded its warranty obligations by requiring consumers to produce the entire maintenance history of the Class Vehicles, including a mandate that all oil changes be completed at a Kia dealership, before determining whether to make the necessary repairs under warranty.  KMA, however, knows that the defect in the Class Vehicles' engines manifests even if the owner or lessee has followed Kia's oil change guidelines.  Even if consumers produce their vehicles' maintenance history, KMA blames the defect and engine failure on the consumer, refuses to cover the necessary repairs under warranty, and charges as much as $10,000 to repair/replace the engine.

97.     Kia also advertises that it offers "an industry-leading Kia 10-year or 100,000-mile warranty program."  With respect to the powertrain warranty, however, Kia publicizes the existence of 10 year/100,000 mile powertrain warranty but fails to mention that subsequent owners only receive powertrain warranty coverage for 5 years/60,000 miles.  As such, subsequent owners are left to discover the limited warranty coverage after purchasing their vehicle.  Kia's failure to cover repairs under the powertrain warranty between 5 years/60,000 miles and 10 years/100,000 miles is therefore

---

[6] *See, e.g.*, http://www.kia.com/us/k3/content/media/all/warranty/2014_warranty.pdf (last visited August 7, 2017).

Class Action Complaint
Case No. 8:17-cv-1365

98.     unconscionable and unenforceable.  A typical Kia advertisement touting its warranty is pictured below:



99.     In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the defect, despite such defect having been contained in the Class Vehicles when manufactured by Defendant, repair and replacement of the GDI Engine and the unnecessary and premature replacement of the connecting rods, crank shaft, oil pump, and other engine components.

100.     Furthermore, a number of Class Members, who presented their Class Vehicles to Kia dealerships because of issues related to the defective connecting rod bearings and insufficient engine oil lubrication channels, were denied warranty repairs and, instead, informed that nothing was wrong with their vehicles. As a result, after expiration of the warranty period, Class Members are forced to pay costly repairs to correct the defect.

## CLASS ALLEGATIONS

101.     Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle.

Class Action Complaint
Case No. 8:17-cv-1365

102.   In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above.  Specifically, the state classes consist of the following:

### California Class:

All persons or entities in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

### Maine Class:

All persons or entities in Maine who are current or former owners and/or lessees of a Class Vehicle.

103.   Together, the California Class, the Maine Class, and the Nationwide Class shall be collectively referred to herein as the "Class." Excluded from the Class are KMA, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions based on discovery and further investigation.

104.   <u>Numerosity</u>:  Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased in each of the states that are the subject of the Class.

105.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

a.   The Class Vehicles were sold with a defect;

-40-

b.   KMA knew of the defect but failed to disclose the problem and its consequences to its customers;

c.   A reasonable consumer would consider the defect or its consequences to be material;

d.   KMA has failed to provide free repairs as required by its New Vehicle Limited Warranty and/or Powertrain Warranty;

e.   KMA should be required to disclose the existence of the defect; and

f.   KMA's conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein.

106.   <u>Typicality</u>:  All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs purchased Class Vehicles with the same engine defect, defective vehicle design, and defective engine, as did each member of the Class. Furthermore, Plaintiffs and all Members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

107.   <u>Adequacy</u>:  Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

108.   <u>Superiority</u>:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and Members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant KMA's conduct. It would be virtually impossible for Members of the Class individually to redress effectively the wrongs done to them. Even if the Members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments.

-41-

Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

109. Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## **FIRST CAUSE OF ACTION**

## **VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (Cal. Civ. Code § 1750, *et seq.*)**

### **(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

110. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

111. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class.  Alternatively, Plaintiff Stanczak bring this claim on behalf of himself and on behalf of the California Class against KMA.

112. KMA is a "person" as that term is defined in California Civil Code § 1761(c).

113. Plaintiffs and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

114. KMA engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

-42-

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

115.   KMA's unfair or deceptive acts or practices occurred repeatedly in KMA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

116.   KMA knew that the Class Vehicles and GDI Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

117.   KMA was under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles and the defective nature of the connecting rod bearings and insufficient engine oil lubrication channels because:

a.   KMA was in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

b.   Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

c.   KMA knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect; and

d.   KMA actively concealed the safety and security defect and the associated repair costs by asserting to Plaintiffs and Class Members

-43-

that the cause of their engine problems was the result of Plaintiffs' and the Class Members' inability to maintain the proper engine oil levels despite knowing the repairs needed to correct the defect.

118. In failing to disclose the engine defect and the associated safety risks and repair costs that result from it, KMA has knowingly and intentionally concealed material facts and breached its duty not to do so.

119. The facts concealed or not disclosed by KMA to Plaintiffs and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase KMA's Class Vehicles or pay a lesser price. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

120. Plaintiffs have provided KMA with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a).

121. Plaintiffs' and the other Class Members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

122. Therefore, Plaintiffs and the other Class Members seek all relief available under the CLRA.

## <u>SECOND CAUSE OF ACTION</u>

### VIOLATIONS OF THE CALIFORNIA CALIFORNIA UNFAIR COMPETITION LAWS

### (Cal. Bus. & Prof. Code § 17200)

### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

123. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

124. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself and on behalf of the California Class against KMA.

Class Action Complaint
Case No. 8:17-cv-1365

125.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

126.    KMA has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). KMA should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

127.    The defective connecting rod bearings and insufficient engine oil lubrication channels constitute a safety issue that triggered KMA's duty to disclose the safety issue to consumers.

128.    These acts and practices have deceived Plaintiffs and are likely to deceive the public.  In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendant breached its duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by KMA pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

129.    The injuries suffered by Plaintiffs and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

130.    KMA's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

131.    Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by KMA, to obtain restitutionary disgorgement of all monies and revenues

generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW

#### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

#### (On Behalf of the Nationwide Class or, Alternatively, the California Class)

132.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

133.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself and on behalf of the California Class against KMA.

134.    California Business & Professions Code § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

135.    KMA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to KMA, to be untrue and misleading to consumers, including Plaintiffs and the other Class Members.

136.    KMA has violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

-46-

137.   Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of KMA's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class Members relied on the misrepresentations and/or omissions of KMA with respect to the safety and reliability of the Class Vehicles. KMA's representations were untrue because the Class Vehicles are distributed with defective connecting rod bearings and insufficient engine oil lubrication channels. Had Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

138.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of KMA's business. KMA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

139.   Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin KMA from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money KMA acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## FOURTH CAUSE OF ACTION

## VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT

### (On Behalf of the Maine Class)

140.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

141.   Plaintiff Creps brings this claim on behalf of herself and on behalf of the Maine Class against KMA.

142.   Plaintiff Creps and the Maine Class are persons as that term is defined by Me. Rev. Stat. Ann. tit. 5, § 206(2).

-47-

143.     KMA is engaged in "trade" and "commerce" as those terms are defined by Me. Rev. Stat. Ann. tit. 5, § 206(3).

144.     Maine's Unfair Trade Practices Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. tit. 5, § 207.

145.     KMA has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Creps and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). KMA should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiff Creps and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

146.     The defective connecting rod bearings and insufficient engine oil lubrication channels constitute a safety issue that triggered KMA's duty to disclose the safety issue to consumers.

147.     These acts and practices have deceived Plaintiff Creps and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiff Creps and the Class Members, Defendant breached its duties to disclose these facts, violated Maine's Unfair Trade Practices Act, and caused injuries to Plaintiff Creps and the Class Members. The omissions and acts of concealment by KMA pertained to information that was material to Plaintiff Creps and the Class Members, as it would have been to all reasonable consumers.

148.     The injuries suffered by Plaintiff Creps and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Creps and the Class Members should have reasonably avoided.

149.   The facts concealed or not disclosed by KMA to Plaintiff Creps and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase KMA's Class Vehicles or pay a lesser price. Had Plaintiff Creps and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

150.   Plaintiff Creps' and the other Class Members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

151.   Plaintiff Creps has provided KMA with notice of these violations pursuant to Me. Rev. Stat. Ann. tit. 5, § 213(1-A).

152.   Plaintiff seeks all relief available under Maine's Unfair Trade Practices Act, including the recovery of attorneys' fees and costs pursuant to Me. Rev. Stat. Ann, tit. 5, § 213(2).

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class or, Alternatively, the California Class and the Maine Class)

153.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself and on behalf of the California Class against KMA, and Plaintiff Creps brings this claim on behalf of herself and on behalf of the Maine Class against KMA.

155.   KMA provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain. Accordingly, Defendant's warranties are express warranties under state law.

156.   The parts affected by the defect, including the rotating assembly and engine block, were distributed by KMA in the Class Vehicles and are covered by the warranties KMA provided to all purchasers and lessors of Class Vehicles.

157.   KMA breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

158.   Plaintiffs notified KMA of the breach within a reasonable time, and/or were not required to do so because affording KMA a reasonable opportunity to cure its breach of written warranty would have been futile. KMA also knew of the defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

159.   As a direct and proximate cause of KMA's breach, Plaintiffs and the other Class Members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class Members have also incurred and will continue to incur costs related to the diagnosis and repair of the defective connecting rod bearings and insufficient engine oil lubrication channels.

160.   KMA's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, KMA's warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

161.   The time limits contained in Defendant KMA's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations the terms of which unreasonably favored KMA. A gross disparity in bargaining power existed between KMA and the Class Members, and KMA knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

162.   Plaintiffs and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## SIXTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY

## (On Behalf of the Nationwide Class or, Alternatively, the California Class and the Maine Class)

163.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

164.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself and on behalf of the California Class against KMA, and Plaintiff Creps brings this claim on behalf of herself and on behalf of the Maine Class against KMA.

165.   KMA was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. KMA knew or had reason to know of the specific use for which the Class Vehicles were purchased.

166.   KMA provided Plaintiffs and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles and their engines suffered from defective connecting rod bearings and insufficient engine oil lubrication channels at the time of sale that causes the vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

167.   KMA impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied,

distributed, and/or sold by KMA were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

168. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

169. Defendant KMA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## SEVENTH CAUSE OF ACTION

### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)

### (On behalf of the Nationwide Class or, Alternatively, the California Class and the Maine Class)

170. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

171. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself and on behalf of the California Class against KMA, and Plaintiff Creps brings this claim on behalf of herself and on behalf of the Maine Class against KMA.

172. Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

173. Defendant KMA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

174. The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

-52-

175.     Defendant KMA's 5 year/60,000 miles Basic Warranty and 10 year/100,000 miles Powertrain Warranty are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

176.     Defendant KMA breached the express warranties by:

    a.    Providing a 5 year/60,000 miles Basic Warranty and a 10 year/100,000 miles Powertrain Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

    b.    Selling and leasing Class Vehicles with engines that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

    c.    Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the engine or any of its component parts in order to remedy the defective connecting rod bearings and insufficient engine oil lubrication channels.

177.     Plaintiffs and the other Class Members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

178.     Defendant KMA's breach of the express warranties has deprived Plaintiffs and the other Class Members of the benefit of their bargain.

179.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

180.     Defendant KMA has been afforded a reasonable opportunity to cure its breach of the written warranties and/or Plaintiffs and the other Class Members were not required to do so because affording KMA a reasonable opportunity to cure its breach of written warranties would have been futile. Defendant KMA was also on notice of the

alleged defect from the complaints and service requests it received from Class Members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

181. As a direct and proximate cause of KMA's breach of the written warranties, Plaintiffs and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendant KMA's conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

**EIGHTH CAUSE OF ACTION**

**COMMON LAW FRAUD**

**(On Behalf of the Nationwide Class or, Alternatively, the California Class and the Maine Class)**

182. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

183. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself and on behalf of the California Class against KMA, and Plaintiff Creps brings this claim on behalf of herself and on behalf of the Maine Class against KMA.

184. KMA made material omissions concerning a presently existing or past fact. For example, KMA did not fully and truthfully disclose to its customers the true nature of the inherent defect with the GDI Engine, which was not readily discoverable until years later, often after the New Vehicle Limited Warranty or the Powertrain Warranty has expired. As a result, Plaintiffs and the other Class Members were fraudulently induced to lease and/or purchase the Class Vehicles with the said defect and all of the resultant problems.

185. These omissions were made by KMA with knowledge of their falsity, and with the intent that Plaintiffs and the Class Members rely on them.

Class Action Complaint
Case No. 8:17-cv-1365

1    186.    Plaintiffs and the Class Members reasonably relied on these omissions, and
2  suffered damages as a result.

3              **NINTH CAUSE OF ACTION**
4    **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
5  **(On Behalf of the Nationwide Class or, Alternatively, the California Class and the**
6                      **Maine Class)**

7    187.    Plaintiffs and the Class incorporate by reference each preceding and
8  succeeding paragraph as though fully set forth at length herein.

9    188.    Plaintiffs bring this claim on behalf of themselves and on behalf of the
10 Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself
11 and on behalf of the California Class against KMA, and Plaintiff Creps brings this claim
12 on behalf of herself and on behalf of the Maine Class against KMA.

13   189.    All contracts in California and Maine contain an implied covenant of good
14 faith and fair dealing. The implied covenant of good faith and fair dealing is an
15 independent duty and may be breached even if there is no breach of a contract's express
16 terms.

17   190.    KMA breached the covenant of good faith and fair dealing by, *inter alia*,
18 failing to notify Plaintiffs and Class Members of the defective connecting rod bearings
19 and insufficient engine oil lubrication channels in the Class Vehicles, and failing to fully
20 and properly repair this defect.

21   191.    KMA acted in bad faith and/or with a malicious motive to deny Plaintiffs
22 and the Class Members some benefit of the bargain originally intended by the parties,
23 thereby causing them injuries in an amount to be determined at trial.

24 //
25 //
26 //
27 //
28 //

Class Action Complaint
Case No. 8:17-cv-1365

1

**TENTH CAUSE OF ACTION**

2

**VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED**

3

**WARRANTY**

4

**(Cal. Civ. Code §§ 1792, 1791.1, *et seq.*)**

5

**(On Behalf of the Nationwide Class or, Alternatively, the California Class)**

6

    192.    Plaintiffs and the Class incorporate by reference each preceding and

7

succeeding paragraph as though fully set forth at length herein.

8

    193.    Plaintiffs bring this claim on behalf of themselves and on behalf of the

9

Nationwide Class. Alternatively, Plaintiff Stanczak brings this claim on behalf of himself

10

and on behalf of the California Class against KMA.

11

    194.    At all relevant times hereto, KMA was the manufacturer, distributor,

12

warrantor, and/or seller of the Class Vehicles. KMA knew or should have known of the

13

specific use for which the Class Vehicles were purchased.

14

    195.    KMA provided Plaintiffs and the Class Members with an implied warranty

15

that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary

16

purposes for which they were sold. The Class Vehicles, however, are not fit for their

17

ordinary purpose because, *inter alia*, the Class Vehicles and their engines suffered from

18

an inherent defect at the time of sale that causes the Class Vehicles to experience

19

premature and catastrophic engine failure.

20

    196.    The Class Vehicles are not fit for the purpose of providing safe and reliable

21

transportation because of the defect.

22

    197.    KMA impliedly warranted that the Class Vehicles were of merchantable

23

quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a

24

warranty that the Class Vehicles and their engines were manufactured, supplied,

25

distributed, and/or sold by Kia were safe and reliable for providing transportation and

26

would not prematurely and catastrophically fail; and (ii) a warranty that the Class

27

Vehicles and their engines would be fit for their intended use – providing safe and

28

reliable transportation – while the Class Vehicles were being operated.

-56-

198.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose.  nstead, the Class Vehicles are defective, including, but not limited to, the engine defect and/or manufacture of the GDI Engines.

199.   KMA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B. appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

C. award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class Members are entitled;

D. award pre-judgment and post-judgment interest on such monetary relief;

E. grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires KMA to repair, recall, and/or replace the Class vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the engine defect;

F. award reasonable attorneys' fees and costs; and

//
//
//

1        G.  grant such further relief that this Court deems appropriate.

2

3   Dated:  August 8, 2017.          Respectfully submitted,

4

5             By:  */s/ David C. Wright*

           Richard D. McCune

6              David C. Wright

           McCune Wright Arevalo LLP

7              3281 Guasti Road, Suite 100

           Ontario, California 91761

8              Telephone: (909) 557-1250

           Facsimile: (909) 557-1275

9              Email: rdm@mccunewright.com

               dcw@mccunewright.com

10             Joseph G. Sauder

           Matthew D. Schelkopf*

11             Joseph B. Kenney

           McCune Wright Arevalo LLP

12             555 Lancaster Avenue

           Berwyn, Pennsylvania 19312

13             Telephone: (909) 557-1250

           Email: jgs@mccunewright.com

14                 mds@mccunewright.com

               jbk@mccunewright.com

15

           *Pro Hac Vice Applications to be Submitted

16

           Attorneys for Plaintiffs and Putative Class

17

18

19                    **JURY DEMAND**

20       Plaintiffs, on behalf of themselves and the putative Class, demands a trial by jury

21  on all issues so triable.

22             McCuneWright LLP

23

24            By:  */s/ David C. Wright*

           David C. Wright

25             Attorneys for Plaintiffs and Putative Class

26

27

28

Class Action Complaint
Case No. 8:17-cv-1365